The State v. Luke.

THE STATE v. LUKE, *Appellant.*

DIVISION TWO.

1.   **Criminal Law** : MURDER : INDICTMENT.  The averment in an indictment for murder that the fatal blow was given on a specified day, and that the deceased languished one hour and then died, sufficiently charges the date of the death.

2.   —— : ——· : ——.   The indictment in this case *held* to sufficiently charge that the death of the deceased resulted from the effects of the blow inflicted by the defendant.

3.   **Criminal Practice**: POSTPONEMENT OF TRIAL : EXCEPTIONS.   The
refusal of the trial court to postpone the further trial of the cause
until the next day to enable the defendant to procure the attendance
of an absent witness, will not be reviewed in the absence of excep-
tions duly saved.

4.   **Criminal Law** : HOMICIDE : INSTRUCTIONS.   The evidence in this
case *held* to have authorized the court to instruct on murder in the
second degree and on manslaughter in the second, third and fourth
degrees.

5.   **Criminal Practice**: INSTRUCTIONS.   It is not error for the court
to refuse instructions embodying the same principle as those
already given.

6.   ——— : ———.   Where the instructions asked in a criminal case
may confuse the jury, it is the duty of the court to give in lieu of
them an appropriate one on the issue of fact involved.

7.   ——— : NEW TRIAL : NEWLY-DISCOVERED EVIDENCE.   Where on an
application for a new trial because of newly-discovered evidence
its materiality, or the effort which had been made to discover it in
time for the trial, does not appear, the new trial is properly
denied.

*Appeal from Andrew Circuit Court.*—HON.  C.  A.
ANTHONY, Judge.

AFFIRMED.

*John M. Wood*, Attorney General,  for the State.

(1)   The first instruction properly defines the tech-
nical terms.   *State v. Thomas*, 78 Mo. 327 ; *State v. Gee*,
85 Mo. 647.   (2) The second as to  murder in the second
degree is correct.   See above  cases.   (3)   The third as
to the presumption arising from  the wilful  using upon
another a  deadly weapon  at a  vital  part is  correct.
*State v. Talbot*, 73 Mo. 347 ; *State v. Thomas*, 78 Mo.
327.   (4)   The fourth as to manslaughter in the second
degree is correct.   *State v. Thomas, supra.*   (5)   The
fifth as to  manslaughter in  the third degree is correct.
R. S. 1889, secs. 3471, 3478.   (6)   The sixth as to man-
slaughter in the fourth degree is correct.   R.  S., sec.
3477 ; *State v. Umfried*, 76 Mo. 404 ; *State v. Ellis*, 74

Mo. 207 ; *State v. Branstetter*, 65 Mo. 149. ( 7 ) Instruction marked "E," given on the part of defendant, embraced the same principle contained in instructions marked "B" and "C," which were prayed for by defendant, but refused, and no error was committed in refusing to give said instructions. Where proper instructions are given upon any question, it is not error to refuse others containing the same principle. *State v. Walton*, 74 Mo. 270 ; *State v. Smith*, 80 Mo. 516. ( 8 ) The motion for a new trial on the ground of newly-discovered evidence does not state that the evidence is material, or what efforts had been made to discover it in time. *State v. Fritterer*, 65 Mo. 422 ; *State v. Ray*, 53 Mo. 345 ; *State v. Laughlin*, 27 Mo. 111 ; *State v. Butler*, 67 Mo. 59 ; *State v. Barham*, 77 Mo. 52. ( 9 ) The evidence set out in the affidavits filed in support of the motion for a new trial did not tend to prove any manner of defense. *State v. Smith*, 65 Mo. 313 ; *State v. Butler*, *supra* ; *State v. Barham*, *supra*.

MACFARLANE, J.—The defendant was indicted in the criminal court of Buchanan county, for the murder of Frank Callahan. Upon the application of defendant, a change of venue was granted him to Andrew county, in which county defendant was tried and convicted of murder in the second degree.

The evidence on the part of the state shows that, at the time of the homicide, John Self kept a saloon and restaurant on South Sixth street in the city of St. Joseph, Missouri. Early in the evening of Saturday, September 14, 1889, deceased went to this saloon and remained there until the difficulty which is alleged to have resulted in his death. The evening was spent in playing cards with different persons and in drinking. Defendant was engaged in the restaurant as a cook. The evidence does not disclose how he spent his evening, until about eleven o'clock, when he was engaged in cooking supper for Geo. L. Winters, one of the patrons of the house.

The following is the substance of the testimony of Charles Tatum, who was called as a witness by the state: "I am a brakeman on the railroad. I know where John Self's place of business is in St. Joe. It is on South Sixth street. I saw defendant and deceased at that place on the night of the difficulty. I went to that place about eleven o'clock at night. The difficulty commenced in this way: Callahan did not want to go home, on account of its raining at the time; but John Self said he would have to shut up, that he could not keep open for one man. Defendant was in the back room (restaurant) at this time, but came in and said that he (Callahan) had to go when it was time to shut up, and Callahan made the remark that he did not want to go out in the rain; Callahan said if Jim was down there he could stay. He said Jim Self was a gentleman. Luke said, 'Do you mean to insinuate that John Self ain't a gentleman?' Callahan said he didn't know John Self, but he did know Jim Self. By this time I think Mr. Winters came out, and Luke, I think, asked us up to drink, and asked Mr. Callahan to drink. But Callahan would not drink with him; and so we took a drink. Then Callahan asked us to drink, but Luke would not drink with him. So Callahan drank alone. Then they commenced talking about sense. Luke said Callahan had no sense, and Callahan said that he didn't know as he had very much anyway; Luke said he could give him some sense; and Callahan said, 'No, I don't want sense in the way you want to give it to me.' They kept on talking that way a little bit, and then Luke struck him, and then they commenced warding off licks; I don't know as either one hit the other with fists; Luke could not make any headway on him, and he picked up a chair and hit him on the left side of the head; it was a large wooden chair; he took hold of the chair with both hands; when he hit him with the chair, Callahan was standing about a foot and a half from the bar; he said that was a pretty hard blow; I saw some

blood on his ear. After deceased was struck he didn't try to do anything more ; he went out at the door, and defendant went in the kitchen ; he (defendant) soon returned with a butcher knife ; Callahan started to come back into the door, but John Self came from behind the bar and went out and stopped him ; I heard Callahan tell him if he would give him a half a pint of whiskey he would go home ; so John Self said he would, and told him to stay there at the door until he went and got it ; and he got the whiskey and went to the door and gave it to him ; Callahan was drinking some at the time, but he was not what you might call drunk. This occurred about twelve o'clock at night, on the fourteenth of September, 1889 ; I saw the deceased the next day ; had a scar on the left side of his head." Two or three other witnesses testified substantially as did Tatum.

Two police officers testified that between twelve and one o'clock they found deceased lying on the south porch of a vacant office about half a block from Self's saloon. When found he was groaning and unconscious, and died within a few minutes.

The coroner, assisted by two other physicians, made a *post-mortem* examination of deceased. They found a wound on the left side of the head, immediately over the ear, in the form of a triangle, an inch and a quarter running across the head, and an inch and a quarter running down the head, making a flap which raised up with a square corner. It was an ugly-looking wound at the time, and looked as if the skull might be fractured. There were no other visible marks on the body anywhere. On taking off the skull it was found there was no fracture. On the right side of the brain evidence of concussion were found and extravasation. The opinion was that death ensued from concussion produced by a blow on the left side of the head.

Defendant called two witnesses who testified that, between twelve and one o'clock, on the night in question, they were passing on the opposite side of the

vacant office at which deceased was found, and heard and saw two men quarreling, and one of them knocked the other down. The fallen man did not get up, and they ( witnesses ) passed on and saw nothing more.

The court instructed the jury on murder in the second degree and manslaughter in the second, third and fourth degrees.

Defendant asked three instructions which were refused. The first of these, marked " A," was as to the presumption of innocence the law throws around those charged with crime. The other two, " B " and " C," were based on the hypothesis that the fatal blow was struck by some unknown person after the difficulty with defendant and after deceased had left the saloon.

The court gave the following instructions :

" 9.   The court instructs the jury that the defendant is presumed to be innocent of the offenses charged ; that, before you can convict him, the state must overcome that presumption by proving him guilty beyond a reasonable doubt. If you have a reasonable doubt of defendant's guilt, you must acquit him. But a doubt, to authorize an acquittal, must be a substantial doubt, founded on the evidence and not a mere possibility of innocence."

" ( e )   The court instructs the jury that, in order to find the defendant guilty of either murder or manslaughter, they must believe from the evidence, beyond a reasonable doubt, that the deceased came to his death from the effects of the blow of the chair used by the defendant, and not from injuries received afterward in another difficulty or assault.

" ( f )   The court instructs the jury that, if they find the defendant guilty beyond a reasonable doubt, but have a reasonable doubt as to whether the defendant is guilty of murder in the second degree or of manslaughter in either degree, as defined in these instructions, they will find the defendant guilty of the lowest offense."

Defendant filed no abstract of record, brief or assignment of error. We have, as required, made a careful examination of the record and have considered all exceptions found therein, and will briefly state the conclusion reached upon each.

I. Objection was made to the sufficiency of the indictment, in that, as is insisted, it did not charge when the deceased died, or that he died from the effects of a blow received at the hands of defendant. The indictment after charging that on the twentieth day of September, 1889, defendant struck one Frank Callahan on the side of the head with a chair thereby producing a mortal wound, makes the following averment, "of which said mortal wound he, the said Callahan, for the space of one hour, did languish, and languishing died, then and there at said time and place, at said county aforesaid, of the mortal wound aforesaid, so received as aforesaid, by the said Frank Callahan, at the hands of said Adelbert Luke as aforesaid, then and there died."

The charge that the death of deceased resulted from the effects of a blow inflicted by defendant is distinctly made. In that respect the indictment is in the usual approved form. While it is necessary to charge the time of the death of the person killed, it is held sufficient to aver the date of the assault, and that deceased then and there died therefrom. The word "then" has relation to "that" time, and "there" to the place previously stated. *State v. Steeley*, 65 Mo. 221; *State v. Sundheimer*, 93 Mo. 313. The charge that the fatal blow was struck on a specified day, and that deceased languished one hour and then died, sufficiently indicates the date of the death.

II. After the trial had progressed to near the conclusion, defendant asked for a postponement until the next day in order that he might have opportunity to procure the attendance of a witness from another county. The court refused to grant the indulgence, and defendant complains of its action. At the time this

request was made, it was not shown that any diligence had been used to have this witness present at the trial, nor what defendant expected to prove by him. No exception at the time was saved to the action of the court in refusing the postponement. In order to entitle a party to a review of the action of the trial court, it is necessary that exceptions be taken at the time of the adverse ruling. This rule applies as well to criminal, as to eivil, cases. *State v. Elvins*, 101 Mo. 246; *State v. Brannum*, 95 Mo. 22; *State v. McDonald*, 35 Mo. 542.

The affidavit of defendant in support of his motion for a new trial, to the effect that he had applied for a postponement for the purpose of giving him time to procure the attendance of witnesses, gives no additional support to his claim to have the action of the court reviewed, though he does state in the affidavit that he was not informed, until his application was made, that the evidence of the absent witnesses would corroborate other of his witnesses on a material fact. That information should have been given the court at the time the application was made. The record shows that the application, at the time it was made, was put upon the ground that defendant supposed the absent witnesses had been recognized by the state to be present to testify at the trial. Proper diligence required him to use all proper means to enforce the attendance of his witnesses, and not depend upon the diligence of the state to assist him. The action of the court was entirely justifiable under the circumstances. So far as the court was advised the application was merely for the purpose of delay and was properly overruled.

III. The evidence in the case warranted the court in instructing the jury on murder in the second degree and manslaughter in the second, third and fourth degrees. This the court did by instructions entirely unobjectionable. The court also properly instructed the jury on the presumption of defendant's innocence,

and that the state was required to overcome that presumption by proving him guilty beyond a reasonable doubt. This instruction covering the same principle as that contained in instruction "a" asked by defendant rendered the latter unnecessary, and there was no error in refusing it.

Instructions "b" and "c," asked by defendant and refused by the court, were mere repetitions of the same propositions in different language.

The court may reasonably have been dissatisfied with them both, and believed them to be calculated to confuse rather than enlighten the jury. Under such circumstances it was the duty of the court to give the jury an appropriate instruction upon the issue of fact involved. *State v. Jones*, 61 Mo. 234; *State v. Walton*, 74 Mo. 270; *State v. Smith*, 80 Mo. 517.

Instruction "e" given by the court in simple, clear and intelligible language fully covered the principle contained in the instructions refused. Defendant could not have been prejudiced by a refusal to give these instructions.

IV. In his motion for a new trial, and as grounds therefor, defendant stated that since the trial he had discovered new evidence but does not state its materiality or the efforts that had been used to discover it in time for the trial. These omissions were themselves sufficient justification to the court in overruling the point. *State v. Fritterer*, 65 Mo. 422; *Snyder v. Burnham*, 77 Mo. 52; *State v. Butler*, 67 Mo. 59.

Besides, from the affidavits filed it appears that the newly-discovered evidence was that of the witnesses whose knowledge was learned during the progress of the trial, and to obtain whose testimony a postponement was asked. The ruling of the court on this question has been considered under paragraph 2.

We have given careful examination and consideration of the record in this case, and all questions involved therein, and find no error justifying a reversal of the judgment. Judgment affirmed; all concur.