LACKEY *et al.* v. STATE *ex rel.* GRANT *et al.*

No. 2666.   Opinion Filed July 11, 1911.

(116 Pac. 913.)

1.  **MUNICIPAL CORPORATIONS—Freeholders' Charter—Form of Government—Validity.** The charter of Oklahoma City, adopted March 11, 1911, by the qualified voters of that city in pursuance of section 3a, art. 18, of the Constitution, authorizing cities containing a population of more than 2,000 inhabitants to frame charters for their own government, consistent with and subject to the Constitution and laws of the state, provides by certain of its sections that the elective officers of the city under the charter shall be five commissioners, naming them, who shall be elected by the city at large, and vests said commissioners as officers of the municipality with the exercise of the general powers granted by the charter to the corporation. **Held,** that said provision of the charter superseded sections 348 and 353, Wilson's Rev. & Ann. St. (sections 645, 648, Comp. Laws, 1909), by which it is provided that the powers conferred upon cities of the first class shall be exercised by the mayor and council of said cities, and that the members of the council shall be elected from wards.

2.  **SAME—Charter—Operation—Municipal Election.** Section 3, art. 10, of said charter provides that a special election shall be held on the eighth Tuesday after the adoption and approval of the charter for the election of the mayor and commissioners provided for by the charter. **Held,** that said section is not inconsistent with section 4, art. 3, of the Constitution, and it supersedes that portion of section 1 of the act of the Legislature approved March 24, 1910 (Sess. Laws 1910, p. 178), which provides that in all cases in which commission forms of government shall be adopted by cities under article 18 of the Constitution, more than four months before any general election of officers provided for by said act, the legislative authority of such cities shall have power to call a special election for the election of the elective officers under the charter, and where the charter is adopted less than four months before the next general municipal election of officers, said election of officers under the charter shall be at such general election.

(Syllabus by the Court.)

*Error from Superior Court, Oklahoma County; Edward Dewes Oldfield, Judge.*

Mandamus by the State, on relation of Whit M. Grant and others, against Dan V. Lackey and others to compel the surrender of the books, records, funds, and other property of the

city, claimed to be held by them in an official capacity.   Judgment for relators, and respondents bring error.   Affirmed.

*Flynn, Chambers & Low, Everest, Smith & Campbell,* and *Warren K. Snyder,* for plaintiffs in error.

*Jas. S. Twyford, Stuart, Cruce & Gilbert, Geo. A. Matlack,* and *J. W. Johnson,* for defendants in error.

HAYES, J.   On the 8th day of November, 1910, in pursuance of a resolution passed by the city council of Oklahoma City, an election was held in that city at which freeholders were elected for the purpose of writing a charter to be submitted to the qualified electors of the city.   'The freeholders elected at said election made, prepared, and compiled a charter to be submitted to the qualified electors for their rejection or adoption, and thereafter, on the 8th day of March, 1911, the proposed charter was voted upon at an election held within said city, at which more than three-fourths of the voters voting thereon cast their ballots in favor of the adoption of the charter.   On the 14th day of March, 1911, the charter was presented to the Governor, and by him in all things approved.   Section 1, art. 2, of that charter provides that the elective officers of the city shall be five commissioners, namely, the mayor, who is the commissioner of public affairs, a commissioner of accounting and finance, a commissioner of public safety, a commissioner of public works, and a commissioner of public property, all of whom shall be elected at large by the qualified electors of the city for a term of four years and until their successors are elected and qualified.   Section 3 of article 10 of the charter provides that there shall be held on the eighth Tuesday after the charter shall have been adopted and approved by the Governor an election in the city for the purpose of electing the five commissioners provided for by the charter, who, when elected, shall constitute the board of commissioners for the city, with terms of office as provided for in the charter.   Section 4 of the same article adopts and puts in full force and effect in the city, for the purpose of said special election, the general laws of the state applicable to municipal elections.   On the 9th day of

May, 1911, said special election was held, and defendants in error, relators in the court below and hereafter referred to as such, were duly elected as the commissioners provided for under the charter, and, after a canvass of the returns of said election, received certificates of election from the county election board of Oklahoma county. They·thereafter took and subscribed to the oath of office required by law, and executed bonds in the sum prescribed by the charter, which were approved, and each of them then took possession of the office to which he was elected and entered upon the discharge of its respective duties. Respondents, who constituted the officers of the city and were in charge thereof, and engaged in administering the affairs of the city prior to the adoption of the charter, are in possession of the books, records, funds, and other property of the city, which are necessary to relators in the discharge of their official duties. Relators charge in their petition that respondents, acting together, wrongfully refuse to turn over to relators the books, records, and property of the city, and they pray in their petition for a writ of mandamus requiring respondents to deliver to them all books, accounts, contracts, records, paraphernalia, and all other property now .in the possession of respondents belonging to the city. Respondents by their answer first make a general denial of the allegations of relators' petition, and then make certain specific admissions, and lastly they make various allegations of affirmative facts; but it will not be necessary to set out in further detail the pleadings. Some questions that might have been raised under the pleadings have been expressly waived by counsel in their presentation of the case to the court.

The contentions made by respondents in this court present two propositions for our consideration and determination, the first of which is: Has the city of Oklahoma City, which is now and has been for several years past a city of the first class, power to frame and adopt a charter which provides for the administering of its municipal affairs by a board of five commissioners elected by the people at large? And, second, Were relators elected at an election authorized by law?

Prior to the admission of the state into the Union, there existed in the territory now constituting the state two sets of municipal corporations, organized under two different general statutes. One set of these corporations was organized and their powers fixed under the provisions of chapter 29 of Mansfield's Digest of the Statutes of Arkansas, extended in force in the Indian Territory by Act of Congress approved June 28, 1898 (Act June 28, 1898, c. 517, 30 Stat. 495). The other set had been organized and their powers defined by chapters 12 and 13 of Wilson's Revised and Annotated Statutes of the Territory of Oklahoma of 1903, as amended by subsequent acts of the territorial Legislature. None of these municipal corporations were destroyed by the admission of the state, but all of them, by specific provision of the Constitution, were continued; but the general statutes in force in the Indian Territory side of the state, constituting the charter of such corporations, were superseded by the statutes of Oklahoma Territory, extended in force in the state; and while the municipal corporations of the Indian Territory continued to exist as municipal corporations in the state after its admission, the powers of such corporations, except as otherwise provided by the Constitution, are to be found in the general statutes of Oklahoma Territory, extended in force in the state, providing for the organization of municipal corporations and defining their powers. *State ex rel. v. Ledbetter*, 22 Okla. 251, 97 Pac. 834. Upon the admission of the state, there existed therein no municipal corporations with any other charter than that which was provided by some statute extended in force in the state.

Section 1 of article 18 of the Constitution provides:

"Municipal corporations shall not be created by special laws, but the Legislature, by general laws shall provide for the incorporation and organization of cities and towns and the classification of same in proportion to population, subject to the provisions of this article."

The power of the legislative department of the state to create municipal corporations and define their power is recognized by this section of the Constitution, which, in specific terms, puts certain limitation upon said power in that it prohibits the creation

of any such corporaton by a special law, and, on the other hand, commands that the ·creation of such corporations and their organization, so far as provided for by the Legislature, shall be by general laws; and it further directs that the classification of such incorporated towns and cities shall be based upon their population, and, added to these limitations of the section, is the further limitation that the powers therein named shall be exercised subject to the provisions of the article of which this section forms a part. The second section of the same article reads:

"Every municipal corporation now existing within this state shall continue with all of its present rights and powers until otherwise provided by law, and shall always have the additional rights and powers conferred by this Constitution."

The rights and powers possessed by municipal corporations of the state at the time of its admission, as before stated, were fixed by the statutes of the territory of Oklahoma, extended in force in the state by the Schedule to the Constitution; but the foregoing section adds to these rights, which shall continue to exist until otherwise provided by law, the rights and powers provided by the Constitution. What are some of those additional rights and powers conferred·by the Constitution and referred to by said section 2, art. 18?. One of them is to be found in section 3a of the same article, which provides:

"Any city containing a population of more than two thousand inhabitants may frame a charter for its own government consistent with and subject to the Constitution and laws of this state, by causing a board of freeholders, composed of two from each ward, who shall be qualified electors of said city," etc.

Then follows provision somewhat in detail for the election of a board of freeholders and the preparing and proposing of a charter and the adoption thereof at an election to be held in the city; and, if a majority of the qualified electors voting thereon shall ratify such charter, it is then provided that the same shall be submitted to the Governor for his approval, and that the Governor shall approve it, if it shall not be in conflict with the Constitution and laws of the state. Then follows a provision that:

"Upon such approval it shall become the organic law of such

city and supersede any existing charter and all amendments thereof and all ordinances inconsistent with it."

Counsel for respondents concede that the foregoing section authorizes cities and towns having the population specified to frame a charter for their own government, but they insist that that portion of the section reading "consistent with and subject to the Constitution and laws of the state" renders invalid any provision of such a charter that is in conflict with any law of the state, whether such law pertains to general matters of the state and its government, or peculiarly to municipal affairs. Uninfluenced by the context of the section in which the foregoing clause is found, there is reason in the broad language of this clause to support respondents' contention; but this clause must be read in connection with the whole section and all its parts, and the whole be construed so· as to give each and every part meaning and force. It must have been contemplated by the framers of the Constitution and the people in adopting it that the charters authorized by this section to be framed by the cities would not be uniform, but would be adapted to the various needs of the localities in which they are adopted; and that some of them, if not all, would, in some respects, conflict with the charters theretofore existing in such municipalities; for, unless such be true, then that portion of the section providing that upon such a charter being approved it shall become the organic law of the municipality, and supersede any existing charter, is meaningless. All municipal corporations that now exist or may hereafter exist in this state may be classified with respect to the time or their creation into two classes—first, those existing at the time of the admission of the state, and, second, those created thereafter. The charter of those existing at the time of the admission of the state consists of the statutes extended in force, defining their powers and regulating the exercise thereof, and except as is authorized by section 3a, article 18, the charter of all corporations of the second class will always be found in a general statute of the state; for, by section 1, article 18, *supra,* the Legislature is prohibited from granting to such corporations powers in any other

way. The framers of the Constitution must have been aware of this condition when they provided that the newly created charter by the freeholders should supersede any existing charters, and must have known that in order for a newly created charter to supersede an existing charter it must supersede some statute of the state. If it was meant that the freeholders could adopt only a charter in conformity with the provisions of the general statutes, and add thereto provisions not inconsistent with the statute creating such corporations, that would not be the formation of a new charter, but would be the adoption of the previously existing charter, with amendments thereto not inconsistent with its previous provisions.

Again, if the present general statute for the organization of municipal corporations does not cover and make provisions for all municipal affairs, still, the Legislature might, under the construction contended for by respondents, pass a general act that embraced the entire field of municipal matters, and grant every possible power that could be exercised by such a corporation, or by its terms prohibit any municipal corporation of the state from exercising any power not granted in its provisions. In that event, all that a city could do under the provisions of section 3a, *supra,* in the formation of a charter for its own government, would be to adopt *in haec verba* the general statute. Such a result would render section 3a nugatory and the exercise of any power it is supposed to grant useless, and result in its effectual repeal by an act of the Legislature, without such power having been specifically granted to the Legislature. A construction of this section that will lead to such result ought not to be adopted, when such is not the clear manifest meaning indicated by its terms. It was intended that the Legislature should have power, under the limitations expressed in section 1, art. 18, *supra,* to provide for the incorporation and organization of all cities and towns in the state into municipal corporations except those cities which might in the future exercise the power of framing their own charter as provided by section 3a. By this section the people of the state, in the exercise of their sovereign power and by means of

their organic law, have delegated to the inhabitants of cities having a population of more than 2,000 the power, to be exercised by such inhabitants at their option, to frame a charter for their own local government, which is to become the organic law of such government, and is to supersede the laws of the state in conflict therewith, in so far only as they attempt to regulate merely municipal affairs.

In several states of the Union are to be found constitutional provisions similar to the one here under consideration, granting and guaranteeing to the cities and towns of the state the power to frame their own charters, generally known as freeholders' charters, and there is not an absence of decided cases construing these constitutional provisions; and while we have been unable to find any two Constitutions containing identical provisions upon this subject, the provisions of several of them are so similar that it must be said that the decisions construing them are in conflict, and the conflict is such that it cannot be reconciled. The construction that has been given to these provisions which to us seems supported by the better reason and most in consonance with the spirit and purpose of these provisions, which must be regarded as having been adopted into the Constitutions of the states as result of the popular demand for home rule in municipal affairs in order that the municipalities shall be allowed to govern themselves with greater freedom from legislative interference, has been adopted by the Supreme Court of Missouri. Section 16 of article 9 of the Constitution of that state provides:

"Any city having a population of more than 100,000 inhabitants may frame a charter for its own government, consistent with and subject to the Constitution and laws of this state, by causing a board of thirteen freeholders" to be elected, etc.

The identical language relied upon by respondents as rendering the charter in the instant case invalid is contained in the foregoing provision of the Missouri Constitution. Kansas City, in 1889, acting under that provision of the Constitution, adopted a charter which contained provisions for the improvement of its streets and public highways, and for the assessment of benefits and damages done to private property arising therefrom, that

were in conflict with certain acts of the Legislature, and the valid-ity of such provisions of the charter was attacked in *State ex rel. Kansas City v. Field,* 99 Mo. 352, 12 S. W. 802. The Supreme Court of that state, in upholding the validity of the charter pro-visions, after referring to the case of *Ewing v. Hoblitzelle,* 85 Mo. 76, said:

"Subject to this superior power of the Legislature, the Con-stitution accords to any city having the requisite population the right to frame and adopt a charter for its own government, which will supply its peculiar wants. Charters thus adopted will, of ne-cessity, be more or less at variance, and that they will be unlike, in many respects, is within the contemplation of the Constitu-tion. It is also within the fair contemplation of the Constitu-tion that a charter thus adopted may embrace the entire subject of municipal government, and be a complete and consistent whole."

In a later case, discussing the same provision, the court said:

"The people * * * in their sovereign capacity and by their organic law could delegate to the people of a municipality this power to frame a charter for its own local government, as to matters falling properly within municipal regulation. * * * Such a right is entirely in accord with the genius of our institu-tions, bringing the regulaton and government of local affairs within the observation of those who are to be affected thereby, and at the same time preventing the officious and selfish inter-meddling with the charters of our cities, without the knowledge of those whose rights are affected." (*Kansas City v. Oil Co.,* 140 Mo. 458, 41 S. W. 943.)

And in *Morrow v. Kansas City,* 186 Mo. 675, 85 S. W. 572, it was said:

"It is obvious that the power vested in the Legislature to grant the charters of all cities was by this section of the Consti-tution modified, so that when any city of more than 100,000 in-habitants elected to avail itself of this grant and framed and adopted its own freeholders' charter, then the power of this Leg-islature to govern the purely municipal affairs of such a city ceased, and by this grant the people of the state transferred this legislative power, because the framing of a charter and adopting it is the exercise of legislative power, to the people of such city, but in so doing did not change the nature or extent of the power further than it was made a condition that the charter which it

should frame and adopt should be consistent with and subject to the Constitution and laws of this state. In a word, the people of the state in their sovereign capacity delegated a legislative power, which theretofore had been vested in the Legislature, to the city itself, and when the city availed itself of this privilege, then it ceased to be in the power of the General Assembly to curtail the power thus vested in the city."

Other cases from the same court and to the same effect are: *Badgley v. City of St. Louis*, 149 Mo. 122, 50 S. W. 817; *Brunn v. Kansas City*, 216 Mo. 108, 115 S. W. 446; *Kansas City ex rel. v. Scarritt*, 127 Mo. 642, 29 S. W. 845, 30 S. W. 111.

The doctrine of the Missouri cases has been approved and applied by the Supreme Court of Minnesota in the construction of a similar constitutional provision of that state. *State ex rel. v. District Court of St. Louis Co.*, 90 Minn. 457, 97 N. W. 132; *State ex rel. Ryan et al. v. District Court of Ramsey County et al.*, 87 Minn. 146, 91 N. W. 300; *State ex rel. Getchell v. O'Connor*, 81 Minn. 79, 83 N. W. 498.

The power conferred upon municipal corporations to form their own charter under this provision of the Constitution, as interpreted by the Supreme Court of Missouri, has been well summed up by Mr. Dillon in his able work on Municipal Corporations (5th Ed.) vol. 1, § 63, in the following language:

"Provisions of the freeholders' charter which are purely municipal in their character supersede provisions of the general laws which are inconsistent therewith. * * * These charters do not prevent legislation upon matters not municipal in their character, but affecting the state at large, although such legislation necessarily applies to cities that have framed their own charters, and overrides express provisions contained therein. The words of the Missouri Constitution declaring that a city of prescribed population 'may frame a charter for its own government' do not confer on the city the right, in framing its charter, to assume all the powers that the state may exercise within the city limits, but only powers incident to its municipality. These words mean that the city may frame a charter for the government of itself as a city, including all that is necessary or incident to the government of the municipality, but not all the power that the state has for the protection of the rights and the regulation of the duties of the inhabitants in the city, as between themselves. But

the Legislature may, if it should see fit, confer on a city having a freeholders' charter powers not necessary or incident to the city government.   There are governmental powers, the just exercise of which is essential to happiness and well-being of the people of a particular city, yet which are not of a character essentially appertaining to the city government.   Such powers the state may reserve to be exercised by itself, or it may delegate them to the city; but until so delegated they are reserved."

The first Legislature of the state passed an act approved May 22, 1908, entitled "An act to enable all cities containing a population of more than two thousand inhabitants to frame and adopt charters for their own government, and to extend and define their powers."   Laws 1908, c. 12, art. 4.   Section 1 of that act is a re-enactment in the form of a statute of section 3a of article 18 of the Constitution, *supra*.   Section 4 of the act reads as follows:

"When a charter for any city of this state shall have been framed, adopted and approved according to the provisions of this act, and any provisions of such charter shall be in conflict with any law or laws relating to cities of the first class in force at the time of the adoption and approval of such charter, the provisions of such charter shall prevail and be in full force, notwithstanding such conflict, and shall operate as a repeal or suspension of such state law or laws to the extent of such conflict; and such state law or laws shall not thereafter be operative in so far as they are in conflict with such charter; provided, that such charter shall be consistent with and subject to the provisions of the Constitution, and not in conflict with the provisions of the Constitution and laws relating to the exercise of the initiative and referendum, and other general laws of the state not relative to cities of the first class."

It is clear that the foregoing statute intends to provide that wherever a freeholders' charter has been adopted under the provisions of the Constitution, and conflicts with any law of the state relating to municipal matters of cities of the first class, the provisions of such charter shall prevail; and, if the contention of respondents be correct, then this statute would have to be struck down as in violation of the Constitution, for, if said section 3a requires any charter framed thereunder to be consistent with every law of the state, whether the same pertains to municipal matters or not, then clearly the Legislature could not by its act

free such a charter from such limitation. But courts do not strike down acts of the Legislature as unconstitutional, except when their conflict with the Constitution is beyond reasonable doubt; and this rule applies in the construction of a provision of the Constitution in testing the validity of the act, as well as in the construction of the act itself.

"As to what the doubt shall be upon which the court is to act, we conceive that it can make no difference whether it springs from an endeavor to arrive at the true interpretation of the Constitution, or from a consideration of the law after the meaning of the Constitution has been judicially determined. It has sometimes been supposed that it was the duty of the court, first, to interpret the Constitution, placing upon it a construction that must remain unvarying, and then test the law in question by it, and that any other rule would lead to differing judicial decisions, if the Legislature should put one interpretation upon the Constitution at one time and a different one at another. But the decided cases do not sanction this rule. * * *" (Cooley's Const. Lim. [7th Ed.] p. 254.)

Since the admission of the state into the Union, a great number of the cities of the state have acted under the provisions of the Constitution, and have framed and adopted freeholders' charters by which commission forms of government have been established; and, so far as has been brought to our knowledge, the uniform construction placed upon the constitutional provision here involved by those cities is in harmony with the contentions of relators. To hold otherwise at this time would result in great confusion and disturbance in the municipal affairs of all those cities of the state that have uniformly acted upon this construction of the Constitution. While such reason cannot be a controlling reason upon us, it should have, when supplemented by the reasons already given, a persuasive force.

Sections 348 and 353 of Wilson's Rev. & Ann. St. 1903, provide that powers granted to cities of the first class shall be exercised by the mayor and council of such cities, and that the members of the council shall be elected from wards in the city. To the extent that the charter form of government adopted by Oklahoma City provides that the powers granted to the corpora-

tion shall be administered by a board of commissioners elected from the city at large, it is in conflict with the statute; but whether the powers of such city are exercised by a mayor and a city council, or by a board of commissioners, is purely a matter of municipal and local concern. It in no manner interferes with or infringes upon matters of the state at large, or affects its people generally; and, in the absence of· such provision of the charter being in conflict with any provision of the Constitution, it supersedes the statute.

At the extraordinary session of the second Legislature of the state, there was passed an act approved March 24, 1910, which fixes the date upon which the general elections for the election of officers in cities of the first class and incorporated towns and villages shall be held. Said act contains the following clause:

"Providing, that in all cities in which a commission form of government has been adopted, as provided in article eighteen (18) of the Constitution, the elective officers provided for therein shall be elected at the same time and in the same manner as herein provided for the election of officers in other cities and towns in this state, and provided further, that in all cases in which a commission form of government shall be adopted more than four months before any general election for municipal officers as herein provided, the legislative authority of such city shall have power to call a special election for the election of the elective officers provided for therein, which election shall in all respects be governed by the general election laws of this state." (Sess. Laws 1910, p. 178.)

By this statute, two provisions are made relative to the time of holding the first election for the election of officers under a charter government. If the charter has been adopted more than four months before the next general election for the election of municipal officers, the date of such election must be fixed by the legislative authority of the city. If less than four months before such next general election, then the officers provided for under the charter shall be elected at such next general election. The charter in the case at bar was adopted more than four months before the next general municipal election provided for under said act; but the legislative authority of the city did not

fix any date for the holding of any election for the election of the officers provided for under the charter adopted. As before stated, however, section 3, art. 10, of the charter provides that a special election for the election of the elective officers under the charter shall be held on the eighth Tuesday after the charter shall have been adopted and approved by the Governor, and the election was held on that date. It is the contention of respondents that the act of 1910 controls, and that there has therefore been no legal election held. Whether the act of 1910 controls, depends upon whether section 3 of article 10 of the charter supersedes that act in so far as it attempts to prescribe how the date for holding of such special election shall be fixed. The time of holding a special election for the election of the officers provided for under any charter is a matter that in no way concerns the state at large, or affects the people generally, but pertains peculiarly to the municipality and the people thereof in which the charter has been adopted; and, under the conclusion reached upon the proposition first discussed, the charter will supersede the general act of the Legislature providing for the fixing of the time of such election, unless the charter provision is inconsistent with some provision of the Constitution, which respondents contend to be the case in the instant proceeding.

Section 4 of article 3 of the Constitution provides that:

"The Legislature shall enact laws creating an election board (not more than a majority of whose members shall be selected from the same political party), and shall provide the time and manner of holding and conducting all elections; and, at any time the federal Constitution may permit the election of United States Senators by direct vote of the people, the Legislature shall provide for their election as for the election of Governor and other elective officers."

Counsel for respondents urge that the portion of the foregoing section which provides that the Legislature shall provide the time of holding and conducting all elections, includes all elections held in municipal corporations, both special and general; and that since section 4 by its terms imposes a mandatory duty upon the Legislature to provide the time of holding such elec-

tions, it precludes the power and right of any other body to fix a time for such elections. Without determining whether, if section 4 did impose such duty upon the Legislature, the time of such elections could be fixed in any other manner than by an act of the Legislature, we are of the opinion that said section does not make it the mandatory duty of the Legislature to provide the time of holding elections in municipal corporations. Said section deals with three subjects: First. It provides that the Legislature shall create an election board. Second. That it shall provide the time and manner of holding and conducting all elections. Third. For the election by direct vote of the people of United States Senators, when the federal Constitution shall permit the same to be done. It is clear that the first and third objects intended to be accomplished by this section pertain to elections to be held throughout the state. It does not provide that the Legislature shall create election boards, but that it shall create "an election board." The board here contemplated is a state board, under whose supervision the elections of the state shall be conducted; and we think the second clause likewise has reference only to elections held throughout the state and that would fall under the supervision of said election board. The following section of the same article also imposes a mandatory duty upon the Legislature, in that it provides that the Legislature shall enact laws providing for a mandatory primary system, which shall provide for the nomination of all candidates in all elections, but the framers of the Constitution did not leave the subject open to doubt by not specifying that other elections than state elections were to be included within the provisions of this section; for the phrase "in all elections" is followed by the clause "for state, district, county, and municipal officers."

Section 6 of the same article provides:

"In all elections by the people the vote shall be by ballot and the Legislature shall provide the kind of ticket or ballot to be used and make all such other regulations as may be necessary to detect and punish fraud, and preserve the purity of the ballot; and may, when necessary, provide by law for the registration of electors throughout the state. * * * "

Here again the framers of the Constitution did not leave obscure whether the authority here invested in the Legislature was to be exercised, with reference to state elections alone, in providing for the registration of electors, for the language of the section above quoted is followed by the following clause: "Or in any incorporated city or town thereof, and when it is so provided, no person shall vote at any election unless he shall have registered according to law."

Again, if the provisions of section 4, making it the duty of the Legislature to fix the time of holding "all elections" is construed to include all elections of municipal corporations, special and general, as well as elections throughout the state, then this section is made to conflict directly with other provisions of the Constitution, for, under such construction, the time of holding every election of a municipal corporation, whether special or general, whether for the election of officers or for voting upon initiated or referred propositions, could and should be fixed by an act of the Legislature; but section 3b of article 18 provides that when an election of a board of freeholders is to be had under the provisions of that article, the same may be called "at any time by the legislative authority of the city"; and when a petition has been filed, signed by a number of the qualified electors residing in the city equal to 25 per centum of the total number of votes cast at the next preceding general municipal election, such election shall be called by the chief executive officer of the city within 10 days. Section 4c of the same article provides that when a petition is submitted under the initiative, and demands an amendment to a charter or ordinance or other legal act, other than a grant, extension, or renewal of a franchise, if the petition is not granted by the legislative body of the corporation more than 30 days before the next election at which the city officers are to be elected, then the chief executive officer shall submit to the qualified electors of said city such measure at the next general election; and section 5b provides that, whenever a petition signed by a number of qualified electors equal to 25 per centum of the total number of votes cast at the next preceding general municipal election, demanding that the franchise be granted,

extended, or renewed, shall be filed with the chief executive officer of said corporation, the chief executive officer shall, within 10 days thereafter, call a special election, at which the question shall be submitted. If section 4, art. 3, *supra,* was intended to include any municipal elections, it was intended to include them all, for no specific exceptions are made by the terms of the section; and under that section, it would then be the duty of the Legislature to fix the time of holding the very class of elections for which provision has been made by the various sections of article 18 above referred to, and there would be irreconcilable conflict between it and those provisions. It is the duty of the courts, where a constitutional provision is susceptible of two constructions, one of which leads to conflict between it and other provisions of the Constitution, to adopt that construction which reconciles them and gives them all force and effect. We are therefore of the opinion that it was not intended by section 4 to make it the mandatory duty of the Legislature to fix the time for holding elections in municipal corporations, and to preclude such time being fixed by the legislative authority of such corporations in charters formed by freeholders and adopted by the legal voters of such corporation. We do not hold that the Legislature has no power to fix the time for holding any or all elections in municipal corporations, except those provided for by the Constitution, or that when so fixed they are not binding upon the municipal corporations, except when in conflict with some provision of a charter adopted by a municipal corporation, under section 3a, art. 18, Const. This power the Legislature would have, unless reserved from it by constitutional provision, without any specific grant thereof, or the imposition of any mandatory duty relative thereto by the Constitution.

No contention is made that the election at which relators were elected was not held in strict conformity with all provisions of the statutes of the state, except as to the time; and, since the time of holding such elections is a mere municipal matter, and the power to fix it is incidental and necessary to the power to frame a charter and organize a municipal government thereunder, the provisions of the charter fixing such time, not being

inconsistent with the Constitution, supersedes the statute, and the election was held at a time authorized and fixed by law.

It follows from these conclusions that the judgment of the trial court awarding the peremptory writ should be affirmed.

All the Justices concur.